May it please the court. Diane Haar, I represent plaintiff appellant William Diesta. This is an appeal of a denial of Social Security disability benefits. William is a homeless gentleman. He suffers from physical injuries. He also has multiple assaults on his brain including viral vulvar myopathy. I can't even say it. He's got a demyelinated brain stem basically from 2001. He had an a concussion after a car accident causing post-concussion syndrome in 2011 and it was this last assault on his brain that finally pushed William out of the workforce. William now spends his days mostly sleeping under a tree in Kalihi and there are two issues on this appeal both involving William's decreased cognitive ability. The first issue is the ALJ erred in finding jobs exist in significant numbers William could perform if he is off task 10% of the workday. Specifically when an ALJ uses a vocational expert the ALJ has to ask a hypothetical question that includes all of the claimants functional limitations both physical and mental. In this case the ALJ asked four questions. In the first two questions she included most of the limitations. Then she asked a third question and that third question included one limitation. That third question was I'm going to ask in your opinion what the tolerances are for an individual being off task throughout the workday outside of normal breaks. So an individual with no further limitations. And the vocational expert said 10% off is the maximum. And so then the ALJ asks so if an individual is off task less than 10% would that individual be able to perform the jobs that you testified to? And the ALJ I'm sorry the vocational expert said yes. Counsel what should the ALJ do? So under Embry v. Bowen and Bray versus the Commissioner as well as their progeny the ALJ has to put all of the limitations into one hypothetical question. The reason for this is the limitations may interact with one another. It makes a difference say if you can do the job of a lawyer and be off task 10% of the day as opposed to say a fast-food worker or a parking lot attendant or even a security guard. So according to Embry and Bray. So counsel is your complaint that the ALJ did not put the 10% limitation in with the other limitations? Is that what you're saying? Exactly because all we know is that someone with no additional limitations could be off task 10% of the day. That's part of it. The other part of it is the ALJ adopted in her decision that it was 10% of the day that William would be off task. However she when she asked about jobs that William could perform she asked the question as to less than 10% of the day. So I was actually counsel at the administrative hearing as well. It's in the record. I had on page 115 in the record. I had sought clarification and I said if he's off task 10% or more of the time we're done. And we were done. That's where the hearing ended. Well but since you brought that up then why didn't you ask the question that you think should have been asked at that point? Because my understanding was we were done. But if you thought the question was improper that the ALJ asked you had the opportunity to pose the question in the way that you thought should have been answered by the vocational expert. So why didn't you do that? Because I actually thought that William was more limited. So when I asked my hypothetical questions I asked more limiting questions. I can concede that maybe he is not as limited as I thought during the hearing. But I wouldn't have combined those limitations because I wouldn't have thought he'd be off task 10% of the day. I thought he'd be off task a heck of a lot more than that. And those were my questions. What were the actual jobs that were at stake at that point? That was some inspector job and some. I mean I guess this has to do with the other question. The fact that they didn't ask whether it was a contradiction with the DOT. But it seems pretty odd to me that somebody who was supposed to be doing surveillance could be off task 10% of the time. But you In the decision the ALJ found that he could do the jobs of small products assembler, inspector, and marker. I see. So the surveillance was no longer there? No, it was no longer there. I see. But an inspector, if things are going by and you maybe I was just imagining. I've researched this job before and it goes all the way up to missile inspector. I don't think this DOT code did. But my position is Gallant v. Heckler, Embry v. Bowen, they tell us the vocational expert testimony can't be substantial evidence if all the limitations are not in one question. Do you literally mean they have to be in one question or could they say and if he had all those those limitations and also was off task 10% of the time? You can do that because that does put them all in one question. In her question it was just an individual. So someone with no limitations. Just an individual. How much could an individual be off task? And that's a different thing. But the ALJ at step 5 also has the burden of showing jobs exist in significant numbers. So it wasn't my burden to prove that. It was actually her burden. And I'm saying that she didn't meet the burden. And that's one of the reasons why we need to remand this case. There is a second error as to the jobs on why we need to remand this case. And that is the ALJ is required to ask, and this is under Massachi v. Astru and its progeny, as well as Social Security ruling 00-4P. The ALJ has an affirmative duty to ask the vocational expert if the vocational experts testimony is consistent with the Dictionary of Occupational Titles. And I know the district court said there was no duty in this case because being off task isn't in the Dictionary of Occupational Titles. Well SSR 00-4P tells us that's exactly when the ALJ has to ask. And the reason for that is the ALJ has to ensure that there's a reasonable basis for her to rely on the reasonable basis for the vocational experts testimony, because the ALJ never asked. Massachi actually says it's legal error, but it can be ignored if it's harmless. In this case, it's not harmless because we don't know if there's a reasonable basis. So that's another reason it should be remanded as well. What about the testimony of Dr. Donovan? That's where I was headed now. So this is the second issue in the case. The ALJ failed to give clear and convincing reasons for rejecting Dr. Donovan's medical opinions. So these medical opinions are on page 420 in the record. I realize there's four opinions. I'm only talking about two through four because the first one is actually not disabling, and I know I discussed that in my brief. So the problem here, there's multiple problems here. First, the ALJ has to provide clear and convincing reasons for uncontradicted opinions or specific and legitimate reasons where they are. In this case, Dr. Donovan did extensive objective testing, he did a psychological interview, he did behavioral observations, and he formed his four opinions. The ALJ, with regard to the second and third opinion, it's not actually clear that she gave reasons for rejecting these opinions. So Embry tells us the ALJ is required to give sufficiently specific reasons for rejecting the opinions. She has to provide reasons as to why the ALJ's own interpretation of the objective findings is correct and the doctors are incorrect. And in this case, you'll notice the word objective findings. So one of the things with the second and third opinion and the fourth is the ALJ never gave us objective findings which contradicted Dr. Donovan's opinions. Tell me again, his opinions are exactly where? They're on page 420 of the record and we're only talking about opinions two through four. Oh, you're trying to pick a list. I got it. Yeah, a list. There was one opinion, meaning one report. I'm sorry? It was one report, not four reports. Yeah, no, no, no. Four opinions, one report. Did this person, Dr. Donovan, worked for the Social Security Administration? He was an examining physician? Yeah, he contracted. So they sent William to him because they didn't have enough evidence in the file. So they wanted this examination to determine whether William was disabled. This is the only psychological examination as such? Yes, it is. All right. So going back to opinions two and three, if the ALJ actually did provide a rejection in her opinion, so she analyzes Dr. Donovan's opinion on page 53 of her decision, the last sentence is the only thing that could possibly be construed as this, and it's, claim it clearly remembers what he used to do and stated he probably could still do it but for his dizziness. So this is hearing testimony, and one of the things that Lester V. Chater, where it's discussing Gallant V. Heckler, talks about is it says that it's unacceptable to rely on a non-examining physician's opinion where the ALJ submits her own opinion with that. They found that unacceptable to defeat an examining doctor's opinion. In this case, it's just the ALJ's opinion. So the ALJ is giving her observations of how William performed at the hearing. And how William did perform at the hearing is she's saying he clearly remembers what he used to do. So she was asking what he did as a handyman, and he could say he changed doors, he waxed floors, he stripped floors, but he never said how to do these things. When she asked him if he remembered how to do these, or if he still could do these actually, he started to say he could not because of his dizziness, which she puts in her decision. He also said something about his back, and then she cut him off. So it's not clear where he was going with this. This is at page 109 in the record. That goes over the testimony. In any case, because this was entirely her opinion, Lester tells us, Lester talking about Gallant tells us that this is unacceptable. This can't be used to defeat Dr. Donovan's opinions. But I want to get quickly on to Opinion 4, since I'm quickly running out of time. You actually ran out of time. Oh, my apologies. And I should probably sit down. What do you want to say about Opinion 4? I want to say that that's not any better supported. There's no objective evidence to defeat Dr. Donovan's opinion. In this case, she actually gives reasons. Her reasons include... My apologies. So her reasons include that William never walked off the job as Dr. Donovan opined that he would do when he was working. Now, when... The definition of disability for Social Security is you're no longer able to perform substantial gainful activities. So you're no longer able to work because of your medical condition. It stands to reason William didn't walk off the job while he was working. But besides which, she says, I cannot accept Dr. Donovan's opinion to claim he cannot handle the pace of work because he walks away from his work when things are bad. That's not what he said. He said he can't handle the pace of work and I think he would walk away from his work when things are bad because of that. So that's just not what he said. Well, he also threw in that he felt that it's because William would get frustrated if he was given projects that exceeded his expectations. Yes, but his first position was that he couldn't handle the pace of work and that the ALJ never really talked about. Well, even the frustration part, this was based on his objective findings. Why do you want to do that? Why don't you just tell me that he didn't rely on cannot handle the pace of work? Your Honor, I have no idea why they didn't get this guy out from underneath his tree, honestly. All right. Thank you, counsel. Thank you so much. Thank you. Good morning. May it please the Court. Sean Mody on behalf of Nancy Berryhill, Acting Commissioner of Social Security. Whereas here we have clear evidence from the vocational expert, claims physicians and claiming himself by his ability to work during a relevant period, the ALJ's non-disability finding was already affirmed. Starting first with the VE's testimony about whether an individual could still work in the national economy while being off-task for up to and including 10% of the work day, the VE's testimony indicates that that was the case. Well, as I understand the argument, that's not the question. The question is whether a person who has his other issues and is off-task 10% of the time can find a job in the national economy, not just any person. So the way you just stated it was the way the VE testified to it. But is that the right question? I believe it is, Your Honor, because the VE's testimony was, you know, it was, what are the maximum allowable tolerances for somebody to be off-task in the work day? It's a blanket statement. There's no carve-out for certain categories of jobs, certain limitations. It was throughout basically for work. The problem was it wasn't just that he was off-task 10% of the work day. It was also that he was dizzy, unable to concentrate, unable to keep up the pace. There are a number of things. Shouldn't the vocational expert have been asked a question that included all of the disabilities or problems that Mr. Diaz had? Well, Your Honor, the VE had, as to the totality of the limitations regarding, I guess, all of his impairments. So as counsel mentioned, those were in the previous questions, identifying what work is out there. And so those were sort of more specific questions as to his limitations. And then we have a general question that sort of encompasses all of those. What could he do? What is left that he can actually perform of all those possible? What could he actually perform? Well, as they noted as part of the Step 5 determination, the jobs identified were unskilled jobs, small products inspector, I believe, marker. I'm sorry, small products inspector and marker. And so these unskilled positions. And it should be noted as well that it's not in dispute that claimant could have performed these jobs if he were off-task for up to the very limit of 10%. So the question is whether we needed that extra sort of clarification. But we submit that it wasn't necessary because we already have that blanket statement that 10% was the maximum allowable tolerance that anybody could be off-task and still work. And, again, as I note, there's no exceptions made for any specific limitations. There's no carve-outs for certain categories of occupations. It doesn't sound very logical. I mean, you could have a small products inspector who's supposed to be making sure these products are okay, but 10% of the time he's not going to be doing it. Well, Your Honor, he's off-task. It doesn't mean he's off work. I mean, any number of jobs you would be working, but you may not be doing a specific task that is your primary job. You might be doing other tasks. What does off-task mean? Well, off-task, as I noted, doesn't necessarily mean it's here. What does it mean? Here it was defined as being off-task outside of normal breaks. And so I think it is constant. Meaning not doing the job? I think it's contemplated as being maybe not as productive in doing that. Unable to do the job? Something else other than what you're supposed to be. Off-task means you're not doing the task. That's what it means. Yeah, you're doing something other than what you might be assigned. So you're not inspecting. Yes, but you're not not working either. You may not be not inspecting, but you're not off the job either. You're still working. I understand that, but an inspector who's not inspecting. I mean, Your Honor, I think we can look at any category of jobs. We look at just the title of the job, but that's not all you do, correct? Maybe filling out forms. Yeah, you could be answering calls. You could be making calls. You could be doing any number of things. You know, we're lawyers. We're not just lawying all day long. You know, we have conversations.  Yeah, we're lawyers. But it's these products. I mean, we're focusing on just the one job, but there's still the inspector and there's still the assembler and marker positions as well. So this is not – I mean, we can laugh about the inspection position, but it's not simply the sole position there. And we are looking at unchallenged unquestioned V.E. testimony. And, you know, under this Court's precedent, the V.E.'s expertise is sufficient foundation for her testimony. But she has to be asked the right question. And we do have legions of case law that says that all of the impairments have to be considered together when asking the V.E. to describe what types of work could be performed that are out there in the national economy. Well, yes, Your Honor, but we've got sort of this combination of questions that kind of lead us to the answer. The question really was – I mean, it's not even – actually, this whole part isn't even my most important concern. My biggest concern, to lay it out for you, is that the ALJ did not seem to give clear and convincing reasons for rejecting the examining physician. And what's very – what was kind of interesting to me in this case was that the typical case, we were looking at the treating physician, that is the claimant's own doctor who treats them, was usually being discredited by the ALJ for the Social Security Administration. Here we have the Social Security Administration's own doctor who says there's one to four disabilities, and she really doesn't give clear and convincing reasons for discounting those things. She kind of argues or quibbles with them, but they're not real reasons. And also, she kind of distorts what he said, but she doesn't give real reasons for discrediting these impairments that he has. Well, I want to clarify a couple of points because I think – well, first of all, the consultative examination, that is the only sort of examining physician's opinion in the record, but it's not the only opinion in the record. We have two opinions from the state agency reviewing physicians who both review Dr. Donovan – Well, first of all, I don't – they were not psychologists, right? Yes, they were, Your Honor. They were psychologists, not neurologists? Yes, Your Honor. They were both psychologists, just like Dr. Donovan. I never understood how any ethical professional can do that. How can he look at the same information and express an opinion when he hasn't met the guy? Your Honor, I think where they get that is that they're not just looking at one examination. They're looking at the totality of records, and I think that is the point that comes through through the ALJ's evaluation of Dr. Donovan's opinion, is that Dr. Donovan's opinion is really an outlier in this record. Well, but that's not what he said, you see. This is what bothers me. I don't even think he relied on those other people, did he? It's referenced on the same page, I believe, or maybe – let me double-check. What page of the record are you on? Your Honor, I am referencing – so Dr. Donovan's opinion is discussed in his excerpts of record, page 53. The ALJ references the state agency reviewing physicians' opinions on pages ER 52 and 53. So just above the discussion of Dr. Donovan's opinion, and notes that – and cites those opinions. But it's not those people. Excuse me, Your Honor? I don't see any reference to the reviewing – oh, I see. Excess mild or no restrictions. All right. So then they say there's no restrictions on persistence or pace. Dr. Donovan says that he has a really bad memory and that he isn't going to be able to keep up the pace. And then the reason he gives for not accepting Dr. Donovan's opinion is a complete misreading of what he said, isn't it? Your Honor, I think I would agree that the phrasing could be better in this decision. Well, he didn't say that he couldn't handle the pace of work because he walks away from work. He got completely distracted by this whole thing about walking away from work. And he goes on for three sentences about it. But that was like, you know, a last phrase after he went on in two different of the opinions to say that he could not maintain a normal pace. Well, Your Honor, I think the point that the ALJ was making, and this is a point made throughout the ALJ's decision, which is that claimant gave accounts of his work history, notably his work history both before he was alleged non-state disability and, more importantly, after he is alleged non-state disability. Claimant admitted that he did work after his alleged non-state disability. I know counsel mentioned that he had stopped working, but that's not the case. Where did he stop working? He stopped working right after the car accident, right, where he had vertebrae? That's not the case, Your Honor, actually. The claimant admitted that he worked throughout 2012. He made, I think, up to $6,000 doing handyman work, doing carpentry work, the same work that he outlined at the hearing. Working for his son. Working with his son, Your Honor. And claimant said in the report, so let me note, this is a questionnaire that the claimant himself submitted to the agency. What page? ER 275, Your Honor. Claimant in this questionnaire submitted to the agency said that he worked throughout 2012, and as part of his job he used machines, tools, and equipment, employed technical knowledge and skills, and supervised three people. Nowhere in this report does the claimant mention that he walked away from the job in frustration. What does that have to do with anything? This is during a period where he alleged he was disabled, and we have his own statements indicating that. But that's not the point. The point is that Dr. Jonathan's main opinion was that he couldn't maintain a normal pace of work, and the walking away from work was just sort of a side thing, which is, and he might get so frustrated that he may walk away from work, but that wasn't why he said he couldn't maintain the pace. He said he couldn't maintain the pace, and that's why he might walk away from work. Well, Your Honor, I think, so we've got his admissions about his work history, and as counsel mentioned as well, his testimony that he still maintained the mental capacity to do the job. He mentions it both on ER 115 as well as ER, I believe. All right, but this psychologist did a bunch of psychological tests and discovered that his memory was in the lowest 1% of people, among other things, and that he was functioning at a, what, 45, whatever you call that thing, whatever that standard is. A low 50. And so on, and he isn't, the ALJ doesn't say any of that's wrong. Well, Your Honor, as I mentioned before, this opinion that I want, the point I want to underscore is that it was an outlier because beyond just the state agency reviewing psychologists who both reviewed the opinion and said that it was an overestimate of claimant's limitations, beyond that, as the ALJ noted, no treating physician, as Judge Wardwell mentioned, I think normally in these cases you see a treating physician endorse the claimant's allegations to some degree. They'll submit an opinion in support of their claimant's disability. As ALJ noted, that is not the case here. No treating physician said anything like what Dr. Donovan said, and no treating physician obtained findings that were anywhere resembling what Dr. Donovan said. Well, he didn't have a treating psychologist, did he? He had a treating neurologist. He had repeated neurological examinations on his record, Your Honor. But that's from Kaiser, right? Well, they're, I think, from various providers since his accident in December 2011, and I think up to February 2014, which is, again, after Dr. Donovan's opinion, almost, I think, eight, nine months afterward. All right. And those were normal neurological findings. All right, counsel. You're over your time. Of course. Thank you, Your Honor. Thank you very much. Thank you, Your Honor. I appreciate it. Okay. Thank you, counsel. Diesta v. Berryhill will be submitted, and we'll take up Davis v. Guam.
judges: Wardlaw, Berzon, Rawlinson